**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| RICKY L. SMITH, | : | PRISONER CIVIL RIGHTS |
| Inmate No. 530292, | : | 42 U.S.C. § 1983 |
|     Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:12-CV-328-TWT-JSA |
| | : | |
| EZELL BROWN, | : | |
|     Defendant. | : | |

## **MAGISTRATE JUDGE'S FINAL ORDER AND REPORT AND RECOMMENDATION**

Plaintiff filed the above-styled *pro se* amended civil rights action pursuant to 42 U.S.C. § 1983 on January 31, 2012. The only remaining issue in this lawsuit is whether Newton County Sheriff Ezell Brown violated Plaintiff's equal protection rights through his policy that unlike male pre-trial detainees, female pre-trial detainees at the Newton County Jail are not classified into the maximum security block based upon their pending charges. The matter is before the Court on Defendant Brown's motion for summary judgment with brief in support, statement of material facts ("SMF"), and accompanying exhibits [Docs. 23, 31]; Plaintiff's motion to appoint counsel [Doc. 27]; Plaintiff's motion for summary judgment [Doc. 28]; and Defendant Brown's response [Docs. 29, 30]. The matter is now ripe for decision and, for the reasons discussed below, the undersigned

**RECOMMENDS** that Defendant's motion for summary judgment [Doc. 23] be **GRANTED** and that Plaintiff's motion for summary judgment [Doc. 28] be **DENIED**.

I.   Background

In the original complaint filed on January 31, 2012, Plaintiff named Sheriff Brown and several other persons employed at the Newton County Jail, raising claims for deliberate indifference to his health and safety, deliberate indifference to his medical needs, conditions of his confinement, and equal protection. (Doc. 1). On September 25, 2012, the undersigned conducted a 28 U.S.C. § 1915A frivolity review of Plaintiff's complaint and recommended that Plaintiff's equal protection claim be allowed to proceed against Sheriff Brown and that Plaintiff's remaining claims be dismissed. (Doc. 11). U.S. District Judge Thomas W. Thrash, Jr. adopted the report and recommendation on November 5, 2012 [Doc. 15], and on November 14, 2012, the undersigned entered an order to issue and effect service on Defendant Brown [Doc. 16].

Defendant filed a motion for summary judgment on May 28, 2013. (Doc. 23). In connection with the motion, Defendant filed the SMF [Doc. 23, Attach. 3;

2

Doc. 31], a brief in support [Doc. 23, Attach. 1], and the Declaration of Sammy Banks ("Banks' Decl.") with attached exhibits [Doc. 23, Attach. 2].

On June 21, 2013, Plaintiff filed a pleading that he entitled "Plaintiff's motion for summary judgment" with attached exhibits. (Doc. 28). In deference to Plaintiff's *pro se* status and liberally construing that motion, it appears that Plaintiff's motion is actually Plaintiff's attempt to respond to Defendant Brown's motion for summary judgment. (*See id.* at 2). Defendant filed a response to Plaintiff's "motion for summary judgment" and to Plaintiff's statement of facts contained therein on July 12, 2013. (Docs. 29, 30).

II.   Discussion

   A.   Legal Standard

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Burger King Corp. v. E-Z Eating*, 572 F.3d 1306, 1313 (11th Cir. 2009); Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham v. United States*,

3

724 F.3d 921, 924 (11th Cir. 1984). Here, Defendant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must go beyond the pleadings and come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *Sandoval v. Florida Paradise Lawn Maintenance, Inc.*, 303 F. App'x 802, 804 (11th Cir. 2008); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Unsupported factual allegations and/or speculation are legally insufficient to defeat a summary judgment motion. *Collins v. Ensley*, No. 11-16077, 2012 WL 5870679, at *1 (11th Cir. Nov. 21, 2012); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). *See also Celotex*, 477 U.S. at 324 ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

4

'specific facts showing that there is a genuine issue for trial.'"); *accord Owen v. Willie*, 117 F.3d 1235 (11th Cir. 1997). "The mere scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Finally, "[w]hile *pro se* complaints are entitled to a liberal interpretation, 'a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment.'" *Bryan v. Spillman*, 217 F. App'x 882, 883 n.4 (11th Cir. 2007) (quoting *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990)). *See also Johnson v. Warden*, 491 F. App'x 60, 62 (11th Cir. 2012) ("*Pro se* litigants are not excused from the burden of establishing that there exists a genuine issue of material fact.").

B.   Material Facts

Unless otherwise indicated, the Court draws the undisputed facts taken from Defendant Ezelle's SMF. While Plaintiff set forth a statement of facts in his "motion for summary judgment," his statement of facts does not comply with Local Rule 56.1 in that Plaintiff did not respond to Defendant Brown's SMF with individually numbered, concise, nonargumentative responses corresponding to

5

each numbered material fact or directly refute each fact as set forth in Rule 56.1(B)(2). Nevertheless, although Plaintiff does not escape his burden merely because he is *pro se*, the undersigned has exercised its discretion in considering Plaintiff's statement of facts and relevant exhibits, as well as Defendant's responses in determining what facts are disputed. In sum, the Court has reviewed all legal arguments, all evidence submitted and cited by Defendant Brown, and Plaintiff's exhibits. The Court views all factual inferences from this evidence in the light most favorable to Plaintiff. *See Matsushita*, 475 U.S. at 587; *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994).

Based on this evidence, the following facts are either undisputed or are otherwise viewed in the light most favorable to Plaintiff:

The Newton County Sheriff's Office ("NCSO") has a housing and classification policy by which correctional officers assign detainees to appropriate housing unit and custody levels. (Banks' Decl. at ¶ 5). This classification policy allows correctional staff to identify potential risks to institutional safety, security and order, and reduce the potential for assaults and other disruptive behavior by assessing threat levels and safety requirements and managing and separating inmates into groups based on inmate needs, custody requirements, and resources.

(*Id.* at ¶¶ 6-7).  The NCSO typically completes the formal custody classification process within the first 24 to 72 hours after admission as part of the initial booking process by gathering information about each inmate, evaluating the inmate using objective, verifiable, and documented data, and considering safety and security issues.  (*Id.* at ¶ 10).  The NCSO considers important information in determining an inmate's custody classification, including, *inter alia*, aggressive/assaultive behavior, whether the inmate is considered "at-risk", current offense, criminal history, behavioral information, and history of violent behavior.  (*Id.* at ¶ 11).

The Newton County Jail has the capacity to hold 650 total inmates.  (*Id.* at ¶ 19).  Between 2009 and 2012, on average the jail housed 533 males and 99 female inmates at any given time.  (Banks' Decl. at ¶ 19).  For security reasons, the NCSO has strict policies against housing male and female inmates together.  (Banks' Decl. at ¶ 22).

The NCSO automatically assigns inmates who are charged with murder, rape, armed robbery, aggravated assault, sex crimes, and hate crimes to maximum security, because those inmates are reasonably believed to pose the greatest threat to the safety of correctional staff and other inmates by virtue of their criminal record and past violent behavior.  (Banks' Decl. at ¶¶ 13-14).  In order to reduce

7

the potential for assaults and other disruptive behavior and allow correctional staff to more closely and monitor those inmates in the maximum security unit, only 24 inmates are assigned to each housing unit in maximum security compared to up to 72 inmates in the general population units. (*Id.* at ¶¶ 18-20).

Given the disparity between the number of male and female inmates, the number of females who automatically qualify for maximum security based on their charges is far less than the number of males. (*Id.* at ¶ 20). Specifically, between 2009 and 2012, only 19 total female inmates faced criminal charges that could qualify for automatic assignment to maximum security compared to 207 male inmates in that same time period. (*Id.* at ¶ 21).

The physical layout of the Newton County Jail was designed with only one maximum security housing unit which includes a common area where those inmates in maximum security interact with one another. (Banks' Decl. ¶ 22). In light of the maximum security design limitations and strict security policies against housing male and female inmates together, female inmates are housed together in one unit specifically designated for females. (*Id.*).

The NCSO's internal statistics show, and it is well accepted in the correctional industry, that female inmates do not pose the same risks to

8

institutional safety and security as male inmates since male inmates tend to be more violent and far more likely to engage in physical confrontations and assaults than their female counterparts. (*Id.* at ¶¶ 24-26).  Based on the fact that there are far fewer female inmates at the Newton County Jail who have committed a qualifying offense and because female inmates pose less of a threat to institutional safety, security, and order than male inmates, the NCSO does not operate a separate female maximum security unit. (*Id.* at ¶¶ 23, 28).  Indeed, operating a separate maximum security facility for female inmates would be inefficient and impractical and would waste considerable manpower, resources, and operate well below its full holding capacity. (*Id.* at ¶ 23).  To the extent necessary, however, the NCSO will transfer female inmates to other facilities that can house female inmates in maximum security. (Banks' Decl. at ¶ 39).

Inmates assigned to the maximum security unit have access to all of the same programs and services and are housed in the exact type of cell as inmates assigned to the general population. (*Id.* at ¶ 15).  The only difference between inmates in maximum security and the general population in terms of access to services and programs is that maximum security inmates are prohibited from participating on a work detail. (*Id.* at ¶ 16).  This same restriction also applies to

9

female inmates who have been charged with a violent, maximum-security qualifying offense. (*Id.*).

Finally, when Plaintiff was booked into the Newton County Jail, he was charged with murder, felony murder, aggravated assault, possession of a firearm/knife while trying to commit a crime, pointing or aiming a gun at another, possession of a firearm by a convicted felon, and probation violation, and was automatically assigned to the maximum security unit.[1] (*Id.* at ¶ 31). Also, while at the Newton County Jail, Plaintiff was involved in two separate fighting incidents with other inmates. (*Id.* at ¶ 32).

C. Analysis

1. Relevant Law

Section 1983 of Title 42 provides, in relevant part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

---

[1] Plaintiff subsequently was convicted of malice murder, felony murder, two counts of aggravated assault, two counts of possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon, and was sentenced to life imprisonment. (Banks' Decl. at ¶ 33). Thereafter, Plaintiff was transferred from the Newton County Jail to the Jackson State Prison. (*Id.* at ¶ 34).

>injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Thus, in order to establish a claim under Section 1983, Plaintiff must show a violation of a right secured by the Constitution of the United States and also show that the deprivation was committed by a person acting under color of state law. *Cummings v. DeKalb Cnty.*, 24 F.3d 1349 (11th Cir. 1994); *see also Graham v. Connor*, 490 U.S. 386, 393-94 (1989) ("§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal quotes omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

The Equal Protection Clause of the Fourteenth Amendment forbids that a State "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV § 1. In order to prevail on an equal protection claim, a plaintiff must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001). The "'similarly situated' requirement [is applied] with rigor [because] '[d]ifferent treatment of dissimilarly situated persons does not

11

violate the equal protection clause.'" *Griffin Indust., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007) (quoting *E&T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)); *see also Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1045 (11th Cir. 2008) ("[A] plaintiff must satisfy the 'similarly situated prong . . . whether or not its discrimination claim is based on a suspect classification."). Moreover, any gender-based distinctions "must serve important governmental objectives and must be substantially related to those objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976).

Defendant Brown seeks summary judgment and argues that: (1) male and female inmates incarcerated in the Newton County Jail are not similarly situated; (2) to the extent that male and female inmates are treated differently with regard to housing, any such difference is based on legitimate penological objectives rather than discriminatory intent; and (3) Defendant Brown is entitled to qualified immunity. (Doc. 23, Attach. 1).

> 1. <u>Plaintiff Has Not Demonstrated That He is Similarly Situated to Female Detainees at the Newton County Jail.</u>

In determining whether male and female prisoners are similarly situated for purposes of an equal protection claim, courts should consider "the number of

inmates housed in each facility, their average length of stay, their security levels, and the incidence of violence and victimhood." *Oliver v. Scott*, 276 F.3d 736, 746 (5th Cir. 2002). Here, the number of male inmates at the Newton County Jail exceeds the number of female inmates over five to one, male inmates who automatically qualify for maximum security based on the nature of their charges are nearly ten times that of female inmates, and male inmates are much more likely to engage in violent behavior than female inmates. (Banks' Decl. at ¶¶ 19-20, 23, 25). Female inmates, therefore, pose less of a threat to institutional safety, security, and order than male inmates. (*Id.* at ¶ 28). Accordingly, Plaintiff cannot demonstrate that any female inmate is similarly situated to him for equal protection purposes. *See*, *e.g.*, *Oliver*, 276 F.3d at 747 (rejecting male prisoner's equal protection claim challenging the practice of permitting female guards to monitor male inmates in bathrooms and showers but not using male guards to monitor female inmates under similar circumstances, because, *inter alia*, male and female prisoners were not similarly situated where the prison housed six times as many more men than women, male transfer inmates were convicted of violent crimes whereas female inmates were convicted of the lowest level of felony in Texas, and male units had a higher incidence of violent gang activities and sexual predation);

13

*accord Timm v. Gunter*, 917 F.2d 1093, 1103 (8th Cir. 1990). *See also Veney v. Wyche*, 293 F.3d 726, 734 (4th Cir. 2002) ("[I]t is a well-documented reality that institutions for females generally are much less violent than those for males."); *Yates v. Stalder*, 217 F.3d 332, 335 (5th Cir. 2000) ("If legitimate penological goals can rationally be deemed to support the decision to treat male and female prisoners differently, then they are not similarly situated for equal protection purposes); *Klinger v. Department of Corr.*, 31 F.3d 727, 732 (8th Cir. 1994) ("[F]emale inmates as a class have special characteristics that distinguish them from male inmates, ranging from the fact that they are more likely to . . . be sexual or physical abuse victims. . . . Male inmates, in contrast, are more likely to be violent and predatory than female inmates.").

        2.    <u>The NCSO Has Established Legitimate Penological Objectives For Treating Male and Female Prisoners Differently.</u>

Because this Court has little expertise in the task of prison administration, it should accord a high degree of deference to the NCSO administrators in their adoption and execution of policies and practices that they deem necessary to maintain institutional security. *See Turner v. Safley*, 482 U.S. 78, 85 (1987) (stating that courts should accord a high degree of deference to prison authorities

14

because courts have little expertise in the 'inordinately difficult' task of running prisons); *Bell v. Wolfish*, 441 U.S. 520, 545-47 (1979) (holding that prison administrators should be given "wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

The NCSO segregates female and male prisoners for safety and security reasons, which is a common and necessary practice in the correctional industry. (Banks' Decl. at ¶ 24). *See also Roubideaux v. North Dakota Dep't of Corr. and Rehab.*, 570 F.3d 966, 978 (8th Cir. 2009) ("[W]e begin with the premise that '[i]t is beyond controversy that male and female prisoners may lawfully be segregated . . .' and that '[g]ender-based prison segregation and segregation based upon a prisoner's security levels are common and necessary practices.'") (citations omitted). Due to this necessary segregation policy and: (1) the large disparity between females (a total of 19 from 2009 to 2012) and males (a total of 207 in that same time frame) whose crimes qualify for automatic placement in maximum security; (2) the physical layout of maximum security unit in which there is a common room where all inmates in that unit interact; (3) the fact that female inmates pose less of a threat to institutional safety, security, and order than male

15

inmates; and (4) operating a separate maximum security facility for female inmates would be inefficient, impractical and would waste considerable manpower, resources, and operate well below its full holding capacity, the NCSO does not operate a separate maximum security facility unit for females. The undersigned finds that these gender-based distinctions certainly serve important governmental objectives and are substantially related to the achievement of those objectives. *See Veney v. Wyche*, 293 F.3d 726, 734 (4th Cir. 2002) ("In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the particular safety and security concerns facing male inmates, even though such considerations result in disparate treatment based upon gender."); *Timm*, 917 F.2d at 1103 (holding differences in security concerns at male and female prisons justified differences in security measures taken at each prison); *compare Mathis v. Monza*, No. 13-1845, 2013 WL 3481867, at *3 (3d Cir. July 8, 2013) (finding legitimate and neutral government objective and rejecting male prisoners' equal protection claim that female prisoners received hot meals but male prisoners only received bagged meals because the evidence showed that males used to receive hot meals but began using trays and utensils as weapons, while the jail did not experience the same problem with female inmates). Because

16

Defendant Brown has demonstrated that the gender-based distinctions in security classifications between male and female prisoners is substantially related to important government objectives of safety and security, and Plaintiff does nothing to rebut this showing, Defendant Brown is entitled to summary judgment on Plaintiff's equal protection claim. *See Oliver*, 276 F.3d at 747 (granting summary judgment to defendants on plaintiffs claim challenging the practice of permitting female guards to monitor male inmates in bathrooms and showers but not using male guards to monitor female inmates under similar circumstances because in addition to female and male prisoners not being similarly situated, those same reasons – *i.e.*, six times as many more men than women at the prison, male inmates were convicted of violent crimes whereas female inmates were convicted of the lowest level felony, and male units had a higher incident of violent gang activity and sexual predation – were legitimate penological objectives that justified round-the-clock surveillance by guards of both sexes that applied uniquely to men).  The Court need not address Defendant's qualified immunity argument because Plaintiff has not shown that his constitutional rights were violated.

17

III.  Conclusion

Based on the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that Defendants' motion for summary judgment [Doc. 23] be **GRANTED**, that Plaintiff's motion for summary judgment [Doc. 28] be **DENIED** and that this action be **DISMISSED**.

**IT IS ORDERED** that Plaintiff's motion to appoint counsel [Doc. 27] be **DENIED AS MOOT.** The Clerk is **DIRECTED** to terminate the referral to the undersigned magistrate judge.

**IT IS SO RECOMMENDED AND ORDERED** this 13th day of August, 2013.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

18